# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00330-CV

**City of Austin, Texas, Appellant**

**v.**

**David Saverse, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
## NO. D-1-GN-10-001324, HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

## D I S S E N T I N G   O P I N I O N

I respectfully dissent from the majority decision in this case because I disagree with the majority's application of the standard of review required to reverse the denial of the City's plea to the jurisdiction. Although the question is a close one, unlike the majority, I conclude that Saverse has raised a fact question on the issue of whether the City's alleged conduct constitutes gross negligence. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227-28 (Tex. 2004).

When the jurisdictional evidence implicates the merits, as it does here, the trial court does not act as a factfinder. *University of Tex. v. Poindexter*, 306 S.W.3d 798, 807 (Tex. App.—Austin 2009, no pet.) (explaining that function of plea to jurisdiction does not require plaintiffs to put on merits of case to establish jurisdiction). The relevant evidence in this case is not undisputed, so the City's burden is very similar to that of a movant for summary judgment, meaning that after it "asserts and supports with evidence that the trial court lacks subject matter jurisdiction," we require Saverse "to show [only] that there is a disputed material fact regarding the jurisdictional

issue." *Miranda*, 133 S.W.3d at 228. As with summary judgment, we review the trial court's legal determination in such cases de novo, taking as true all evidence favorable to the nonmovant and indulging every reasonable inference and resolving any doubts in the nonmovant plaintiff's favor. *Id.*; *Poindexter*, 306 S.W.3d at 807. Applying this standard, a review of the evidence shows that Saverse has raised a fact question about the City's actual knowledge and conscious disregard of an extreme risk from this specific tree.

Gross negligence involves an objective component, which is "an extreme degree of risk, considering the probability and magnitude of the potential harm to others," as viewed from the actor's standpoint, and a subjective component, which is the actor's actual awareness of and conscious disregard of the risk. *Louisiana-Pacific Corp. v. Andrade*, 19 S.W.3d 245, 246 (Tex. 1999). After reviewing the evidence presented by both sides, the majority focuses on what it views as the lack of evidence of the subjective component of gross negligence—the lack of any City record identifying this specific tree as a high-risk tree and Passmore's statement that the City had no prior notice of any condition that would cause the tree to fail. In addition, the majority notes that the City's 2008 post-storm tree inspections demonstrate general concern about the risk of falling limbs, as opposed to conscious indifference to an identified risk.

I differ with the majority's analysis. Saverse has shown that there are disputed material facts concerning both the objective and subjective components of the City's alleged gross negligence related to this specific tree. A number of facts support an objective determination that this tree posed an extreme risk.[1] The tree at issue is a mature pecan tree estimated to be between

---

[1] The City addresses the objective component of gross negligence only in terms of the risk posed by falling limbs in general. It does not point to evidence that establishes as a matter of law

2

60 and 120 years old and 45 to 60 feet tall. The large limb that caused Saverse's severe personal injuries and damaged several cars in the parking lot fell 20 to 25 feet. Sevier averred that the tree was in "extremely hazardous condition" at the time of Saverse's injury and that the City knew or should have known that the tree was in this condition and needed "hazard reduction pruning" because of the prior limb failure that occurred at least five years earlier. The City hired an outside tree company to assess trees in the area after Saverse's injury, and the company recommended that the tree be considered for removal, and if not removed, reviewed semiannually for any changes in condition.[2] Passmore testified at his deposition that the tree was in need of trimming at the time of Saverse's injury, and crown-reduction pruning would have reduced the risk of limb failure. The City performed crown-reduction pruning on the tree after the incident. While Passmore testified that all trees are potentially dangerous, and that limb failure will occur on any mature tree, he acknowledged that one factor in determining the level of risk associated with a particular tree is whether the tree has "targets" beneath it. He agreed that there were targets beneath this tree (i.e., the picnic table and parking lot) and described it as "a high-use area in a very high-use park. . . . [with] a lot of park users in the area on a regular basis." Given the size of the tree and its limbs, the location of the tree, the assessment of the tree's condition by both sides' experts and the outside tree company, and the prior limb failure, Saverse raised a fact question about whether the tree posed "an extreme degree of risk, considering the probability and magnitude of the potential harm to others." *Id.*

that this tree did not pose an extreme risk.

[2] The company's 2009 report stated: "The tree has a major wound from a scaffold limb failure during the summer of 2008. Also, new irrigation installation has negatively impacted the tree's critical root zone via trenching." The company rated the tree an 11 out of 12 on its risk scale, with 12 being the highest risk.

Saverse also raised a fact question about the subjective component of gross negligence—whether the City knew about and consciously disregarded the extreme risk posed by this tree. The City does not dispute that the tree suffered at least one instance of a prior limb failure to a large limb higher in the tree canopy than the limb that fell on Saverse. Passmore estimated that the limb was probably similar in size or possibly a little bit smaller than the limb that caused Saverse's serious personal injuries and damaged several cars parked beneath it. Although neither side's expert could pinpoint exactly when the prior limb failure occurred, Sevier estimated it had happened at least five years before Saverse's injury. While the City's records indicate that there were periodic inspections of and work on the trees in the Zilker Park area, which were prompted by notice or complaints involving the trees, Passmore could not locate records that he could say with certainty reflected work done on the tree at issue because the City did not give the Zilker Park trees a unique number before 2008.[3]

Passmore stated in his affidavit that:

> Previous limb failure does indicate an increased potential for future limb failure on a tree. However, a limb failure alone does not mean a tree is a hazard. Good forestry management practice suggests that a limb failure such as the one that occurred and

---

[3] City records attached to Passmore's affidavit indicate that the City assessed the trees in the entire Zilker Park area (60 trees) and removed seven trees in 2004 after two children were injured by a tree limb that had fallen over the hike-and-bike trail. The City does not point to any record that shows that this specific tree was inspected during this 2004 assessment. The City's records of tree maintenance in Zilker Park reflect one instance of broken limb removal in the Hillside Theatre area of Zilker Park in 2007, a request for advice about irrigation trenching around trees in the Hillside Theatre area in June 2008, and a variety of work done on trees at Barton Springs Pool between August 2003 and the time of Saverse's injury. It is not clear from the record whether the City produced other records related to work performed in 2003 or earlier (i.e., five years or more before Saverse's injury when the prior limb failure allegedly occurred) or to prior claims of property damage resulting from limb failures in the park.

injured Mr. Saverse in this case should prompt an assessment of the tree for risk and defects. If the assessment dictates, the tree should receive appropriate maintenance, such as crown reduction.

The City urges in its brief that this industry standard is the appropriate and logical approach for determining when a tree is hazardous: "a limb failure prompts an assessment for risk and defects." Under this standard, then, the City should have conducted an assessment of the tree after the first limb failure at least five years before Saverse's injury. The City has produced no record indicating whether such an assessment was ever conducted. At this procedural stage, any doubts resulting from the City's incomplete records should be resolved in Saverse's favor. It would be reasonable to infer that a limb similar in size to the one that fell on Saverse had to have been removed by the City, and thus, the City knew of the limb failure. It would also be reasonable to infer that the City knew of the limb failure and either failed to perform an appropriate risk assessment or performed an appropriate risk assessment, but then failed to perform appropriate maintenance, both of which indicate conscious disregard of the risk of future limb failure.[4]

As the City correctly points out, even if the evidence showed that the 2008 inspections (or the 2004 inspection) failed to correctly assess the subject tree or that its tree-management policy was misguided, this evidence of careless error would be insufficient to satisfy the heightened standard of gross negligence. But the City's failure to identify the tree as needing maintenance in 2008 should not operate to negate the reasonable inference that it should

---

[4] Passmore testified at his deposition that the two 2008 inspections were "on-the-ground visual inspection[s]," not conducted with bucket trucks. It is reasonable to infer that as time passed and the tree continued to grow, evidence of the prior limb failure may have become more difficult to see from the ground before the limb fell that injured Saverse.

have assessed and properly maintained the tree after the first limb failure at least five years before Saverse's injury. Consequently, Saverse has raised a fact question about the City's actual knowledge and conscious disregard of the extreme risk posed by this tree.

Because I would overrule the City's third issue and proceed to address its remaining issues on appeal, I respectfully dissent.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Filed:   September 30, 2011